HEARD NOVEMBER TERM, 1875.

## BLACKWELL *vs.* TUCKER.

A and B were seized as tenants in common of equal undivided moieties in three tracts of land. B died intestate and A became his administrator, and afterwards, under a bill in equity filed by the heirs of B against A, A became the purchaser of the lands at a sale by the Commissioner. The heirs of B were his widow and children—the latter infants. The Bond of A to the Commissioner was given in 1860, and early in 1863 A applied to the widow to receive Confederate money in payment of a moiety of the purchase money, which she declined to do. In July, 1863, A paid to the Commissioner, in Confederate Treasury bonds, one-half the amount of his bond for the purchase money, but did not inform the Commissioner of the widow's refusal to receive Confederate money : *Held*, That the payment was fraudulent and void, and that A was liable to the widow and children for their moiety of the purchase money.

BEFORE CARPENTER, J., AT EDGEFIELD, JUNE, 1875.

This was an action by Susan Blackwell and her four children, who were infants, and sued by their guardian *ad litem* against Landon Tucker, to set aside and vacate, on the ground of fraud, a payment made in July, 1863, on a bond held by the Commissioner for the benefit of the plaintiff.

The case was as follows:

James Blackwell, husband of the plaintiff, Susan Blackwell, and father of the infant plaintiffs, and the defendant, Landon Tucker, were seized in fee as tenants in common of three tracts of land, each being entitled to one moiety thereof. Blackwell died intestate and the defendant became the administrator of his estate. The widow and children of Blackwell then filed a bill against the defendant for partition of the real estate and a decree was made for the sale thereof. In December, 1860, the sale was made by the Commissioner of the Court and the defendant became the purchaser, and on 3d of December, 1860, gave his bond to the Commissioner for $7,525, the amount of the purchase money, one-half payable one year after date and the other half two years after date.

The following payments were endorsed on the bond :

Received December 3d, 1860..........................$  263  16
Received July 6th, 1863............................... 4,293  00
    (One-half of the bond.)

The endorsements were made by the Commissioner. The case was referred by the Circuit Court to a Referee to take and report the testimony. He reported the testimony of two witnesses, Susan Blackwell and John Blackwell, and they testified that in January or February, 1863, the defendant had a conversation with Mrs. Blackwell in the presence of the other witness, and the defendant said that he wished to pay up what he owed the plaintiff and settle the whole matter. Mrs. Blackwell declined to receive the money ; said that it had so greatly depreciated that it was worthless ; that he would not pay when money was good, and now that it had become worthless because of its great abundance he wished her to take it, but *that* she would not do.

Landon Tucker testified for the defense that in his conversation with Mrs. Blackwell, to which she and her son had testified, he (the witness) had reference to the personal estate ; it was *that* he wished to settle up and pay for in Confederate money.

It further appeared that the payment in July, 1863, was made in Confederate Treasury bonds, and that Tucker said nothing to the Commissioner when he made the payment or at any time before about the conversation with Mrs. Blackwell, which she and her son had testified to or about her refusal to receive Confederate money in payment of the bond to the Commissioner.

His Honor Judge Carpenter decreed that the payment made on the 6th July, 1863, be disallowed and rejected, and that the defend-

ant do pay the full amount due the plaintiffs on the bond to the Commissioner on or before the 1st of October next. That the plaintiffs had a statutory lien on the lands to secure the payment of the purchase money, and that in default of such payment the lands be sold to satisfy the amount due the plaintiffs.

The defendant appealed on the following grounds :

1. Because plaintiffs, being neither obligees nor legal owners of the bond, cannot maintain this action.

2. Because the defendant, having an equal interest with the plaintiffs in the proceeds of said bond, and having paid half thereof to the obligee, the plaintiffs cannot maintain their action against him.

3. Because Z. W. Carwile, the then Commissioner in Equity for Edgefield, the obligee of the bond, having in his official capacity received and acknowledged the receipt of so many dollars from defendant in part payment thereof, the defendant is thereby discharged, if not entirely, at least *pro tanto* from payment thereof, and plaintiffs' redress, if any, for any loss or injury sustained thereby is against Carwile and his sureties on his bond as Commissioner.

4. Because, even admitting the liability of defendant, defendant's payment in Confederate currency having been made and received in good faith, any loss incurred thereby should be borne equally by plaintiffs and defendant, and the judgment of the Court is therefore for too large an amount of money.

*Youmans,* for appellant, with whom was *Griffin :*

On December 3, A. D. 1860, defendant gave bond to Commissioner in Equity for payment of $7,525, one-half in one year and one-half in two years after date, with interest, on which he paid at the date $263.16, and on 6th July, 1863, $4,293. Of the land sold to secure payment of the purchase money of which this bond was given, defendant was half owner and entitled to half the proceeds of sale.

Upon the pleadings set forth and the report of the Referee the Circuit Judge disallows the payment made by defendant and decrees against him for half of the said bond debt and interest, with order for sale and foreclosure. Defendant appeals.

1. The plaintiffs are neither payees or assignees of the bond, nor are they entitled to receive proceeds of the bonds when collected, the defendant being entitled to one-half.

2. The defendant not liable to account to plaintiffs for their moiety, having been discharged by his payments.—*Meyer* vs. *Mordecai*, 1 S. C., 383, and cases cited at 389.

3. The payment in Confederate money having been accepted by the obligee of the bond discharges the obligor.—*Austin* vs. *Kinsman*, 13 Rich. Eq., 266. Even though the obligee be liable.—*McPherson* vs. *Lynah & Gray*, 14 Rich. Eq., 121; *Wiseman & Finley* vs. *Hunter et al.*, 14 Rich. Eq., 167.

4. Decretal order erroneous, not containing statement of facts found and conclusions of law as required.—Code, § 291.

*Bacon*, contra, filed the following points and authorities:

All of the decisions of this State, as well as those of the United States Courts, sustaining payments in Confederate money proceed upon the ground of necessity.

This is true, in especial, of payments made to the Commissioner in Equity (as in this case) by the obligor of bonds given for the purchase of real estate at sales by that officer.

The general opinion of the Court in such cases seems to be that it is hard that the beneficiaries (especially when women and children, as here,) should lose, as it were, the real estate of the testator or intestate because of the inflexible rule of law that payment in Confederate notes by the obligor to the obligee (the Commissioner) is a good and valid payment; and the entire current of the decisions—from *Wiseman & Finley* vs. *Hunter et al.*, (14 Rich. Eq., 171,) to the late case of *Pickens* vs. *Dwight*, (in 4 S. C., 360,)—go to show that if there is the slightest fraud or circumvention or improper combination on the part of the obligor in making such payment the Court will gladly avail itself thereof in order to avoid the inflexible rule and to deal out even-handed justice.

Thus, in *Wiseman & Finley* vs. *Hunter et al.*, it is said: "If any party in the cause was unwilling for Confederate currency or anything but coin to be received, that was the time to say so," (meaning the time when the plaintiffs presented their claims under the order in the case calling in claimants). "And such an objection would certainly have received attention, for the Court would not have authorized the acceptance of anything but the legal tender of

the country against the will of any party interested in the fund. None such was made, and it cannot be listened to now, after payment by the debtor in the manner required of him, and in accordance with a proper construction of the order of the Court. The debtor was no volunteer in this matter."

If such an objection as that indicated in the above case would have been noticed and enforced by the Court, how much more so the objection set up and proved in the present case? For here we have the direct testimony that the widow, when approached by the defendant, Tucker, some months before he made payment to the Commissioner, actually refused to receive the Confederate notes in payment, and assigned a good reason therefor—that they were worthless; that when, on a former occasion, she could have gotten a guardian for her children, he (Tucker) would not pay, and now no one would take such money; and that, notwithstanding such refusal on her part and on the part of her oldest son, John, who was present, (he and the rest of the children being then infants,) the said Tucker sought the Commissioner and paid his bonds in the identical Confederate bonds at a later date, when they were still more worthless than when refused by the plaintiffs. Such a transaction indeed evinces intentional and premeditated fraud upon the beneficiaries and upon the Commissioner, and fraud vitiates every transaction. It was not only a fraud, but a base one, towards the plaintiff and her children, and certainly a *suppressio veri* as to the Commissioner.

And it is remarkable in this case that the said Tucker never testified or pretended that the Commissioner desired to collect the bonds, or even asked for payment. The truth is, the Commissioner had no right to receive the money, as no order had been passed for the collection of the bonds, and the whole transaction shows that Tucker was a volunteer. In fact, it is but fair to presume that Tucker had desired to pay to the Commissioner, who refused to receive, and that he then attempted to get the consent of the plaintiff and her children in order to satisfy that officer.

In *Mayer* vs. *Mordecai*, (1 S. C., 398,) the Court say: "If the satisfaction of the bonds was the result of a fraud between the debtor and the trustee, or induced by an improper combination, to the prejudice of the *cestui que trust*, or if the debtor knew of the intended misapplication of the proceeds by the trustee and in any way wrongfully facilitated the accomplishment of that design, the

instruments would be set up as existing and binding.   But no such proof has been made in this case.   On the contrary, as to the two principal bonds, the trustee required the payment."

The Court in this opinion seems almost to have anticipated just such a state of affairs as occurred in the present instance; for Tucker not only acted fraudulently, but did " wrongfully facilitate " the payment of the bonds in the very notes which the widow and children refused to receive from him.

" It is scarcely necessary to refer to authority," say the Court, in *Johnson* vs. *Crooke,* " to show that what the creditor takes and acknowledges as payment of his debt must be so considered unless some fraud or imposition has been practiced to induce him to receive in lieu of his demands that which was never intended to be accepted as an equivalent for it."—*Johnson* vs. *Crooke,* 3 S. C., 203.

Surely Mrs. Blackwell, the plaintiff, never supposed that after her refusal for herself and her infant children to receive the Confederate notes from Tucker that he would attempt to make payment therein to the Commissioner, and thereby, in the language just quoted, induce him to receive in payment of the bonds " that which was never intended to be accepted."

In *Pickens* vs. *Dwight,* (4 S. C., 360,) it is said that " so far as the bill seeks to set up the bond and mortgage against the obligor and mortgagor, Isaac M. Dwight, it is clear that it cannot be sustained, for they were satisfied by the persons having the legal right and title to receive,—the obligee and mortgagee,—and unless there was fraud or collusion between him and the obligor they must be held to have been paid."

The doctrine of fraud, it will be seen, runs through and is alluded to by the Court in all of these decisions, and the opinion is invariably expressed that in such cases as the present the slightest fraud, circumvention, improper inducement or combination on the part of the payee will vitiate the payment.

The case of *McPherson* vs. *Lynah & Gray* is totally different from this one.   In that case Lynah was not the administrator of the intestate, as was Tucker here, and in that case there was an order for the Commissioner to collect the bonds, and no such order here.   Further, in *Lynah & Gray* the Court say : " The transaction between Mr. Lynah and Mr. Gray was perfectly fair on both sides." And Judge Wardlaw, delivering the opinion, says: " Not intending in the least to indicate the opinion of the Court concerning

suits commenced or even payment demanded by the Master without the order of the Court, we see in the order which we have cited a justification for Mr. Gray's having received payment of Mr. Lynah's bond whenever the latter chose to exercise the right of payment."

It is said also in this case that the Court laid stress upon the fact that the parties interested could have prevented the receipt of the money.

Now, where is there any evidence of fairness throughout this whole transaction on the part of Tucker? On the contrary, he practiced a deliberate and premeditated fraud upon Mrs. Blackwell and her children, and also deceived and misled the Commissioner by a *suppressio veri*,—one of the worst badges of fraud.

"But where the concealment amounts to a willful suppression of facts by a party for his own benefit and the consequent injury of another, under circumstances which render it his duty to have disclosed those facts to the other party, and in respect to which he could not innocently have remained silent, it is beyond all question that such undue concealment will amount to a case of fraud, against the consequences of which the injured party will be relieved by a Court of equity."—Hill on Trustees, *148.

Justice Story carries the doctrine still further.—See 7 Eq. Jurisp., § 207.

And Chancellor Kent makes it still broader.—See 2 Kent's Com., 482.

And under this head—*suppressio veri*—in Hill on Trustees, 148, American edition, it is laid down that "where the parties to the transaction stand in a fiduciary relation one to the other," &c., "the obligation to disclose material facts becomes more imperative and the fraud of concealment proportionally more odious."

"Thus, where a party, in treating for the purchase of a reversion after the determination of the estate for life, carefully suppresses the fact of the death of one of the tenants for life, and by these means obtained a much better bargain, Lord Eldon set aside the purchase."—*Ibid.*

And when the Court remembers that Tucker was the admintstrator of the personal estate of the intestate at the time of his purchase of the land and at the time of his attempt to induce the plaintiffs to receive the Confederate notes, as also at the time of payment, the case is much stronger against him—especially when,

as decided in *Pickens* vs. *Dwight,* the Commissioner was the agent of the parties.

As to the facts :

Only three witnesses were examined before the Referee. Two of them—Mrs. Susan Blackwell and John R. Blackwell—testify in substance that in January or February, 1863, Mr. Tucker proposed to pay to Mrs. Blackwell the " purchase money of the land in question."

She refused to receive it because the " children were all minors, and that money was greatly decreased in value, and she could not get any one to take the money who was at all responsible. It was so plentiful that she couldn't get any one to take it. That she could not get a settlement when she could get good and responsible men as guardians to take good money, and now she would not take it."

" At the time of the conversation in 1863 none of witness's (Mrs. Blackwell's) children were of age."

Tucker " proposed to pay for children, and witness supposes for herself too."

Tucker testified that the conversation alluded to by Mrs. Blackwell and John R. Blackwell " had nothing to do with the bond, but only to the personal estate."

Most certainly the testimony of Mrs. Blackwell and John R. Blackwell must prevail, as against the testimony of Tucker.

Besides that, the Circuit Judge, in his decree, does not hesitate to accept their version of the conversation, and it is useless to refer to authority to shew that this Court will not interfere with the decision of the Circuit Judge upon the facts. The late case of *Means* vs. *Feaster* (4 S. C.) is exhaustive and conclusive as to this point.

Indeed, if Tucker's own testimony is taken as true, it was sufficient to advertise him that Mrs. Blackwell and her children would not receive Confederate bonds. He admits, in his testimony, that the conversation did occur, but says it was as to the personal estate.

And, certainly, if Mrs. Blackwell refused to receive Confederate money for the personal estate, she would not have received it for the real estate.

The attention of the Court is also called to the fact that, according to the testimony, Mrs. Blackwell wanted money to send her son John to school, but she even laid aside that wish rather that receive Confederate bonds. It was an objection so decided that it must have made an impression upon Tucker.

"Every action must be prosecuted in the name of the real party in interest, except as otherwise provided in Section 113."—Voorhies, A. C, 88.

Section 113 simply provides that "an executor or administrator, a trustee of an express trust or a person expressly authorized by statute, may sue without joining with them the person for whose benefit the action is prosecuted."

"The common law rule" as to parties "has ceased to exist in this State since the adoption of the Code."—1 Waite's Practice, 88.

"It is a general rule, capable of practicable application, that the party who will be directly benefited by the successful prosecution of an action and who will be entitled to receive the damages recovered is the proper party to be made the plaintiff in the action, whether his title to the note is legal or equitable; whether an original party to the instrument or not is the real party in interest."— 1 Waite's Practice, 88; *Hasling* vs. *McKinley*, 1 E. D. Smith, 273; *Savage* vs. *Bevins*, 12 How., 166; *Creswell et al.* vs. *Ward*, Supreme Court of Kansas, Central Law Journal, vol. 3, No. 12, p. 188.

The bonds in which payment was made were the issue not of a recognized government, but of one waging war against the United States.— *Warnock* vs. *Austin*, 1 S. C., 421.

*Carroll*, same side, submitted the following additional points and authorities:

1. There was no valid payment ever made by the appellant upon his bond to the Commissioner, Carwile.

(*a*) The alleged payment thereon in July, 1863, was made not in the treasury notes, but in the bonds of the late Confederate States. On the part of the Commissioner the transaction was nothing else than an unauthorized substitution of securities. As the financial officer and agent of the Court, the Commissioner had no right to accept payment save in lawful money or in some recognized currency representing it, and certainly neither of these included the Confederate bonds received by him.

(b) The bonds referred to were under the ban and inhibition of the law. They could not, therefore, in any wise be made available by the appellant in payment of his debt to the Commissioner. In *Horn* vs. *Lockhart*, (17 Wall. R., 580,) it is adjudged by the Supreme Court of the United States that "the bonds of the Confederate States were issued for the avowed purpose of raising funds to prosecute the war then waged by them against the government of the United States," and that any investment in them "was, therefore, a direct contribution to the resources of the Confederate government and an act giving aid and comfort to the enemies of the United States."

2. If the alleged payment upon the appellant's bond were regarded as made in Confederate treasury notes, and if the payment were sustained as between the Commissioner and the appellant, yet, as between the latter and the respondents, it must be held to be ineffectual and void.—*Creighton* vs. *Pringle*, 3 S. C., 77.

The uncontradicted evidence is, that prior to such alleged payment, the respondent, Susan Blackwell, speaking for herself and on behalf of her children, had rejected peremptorily the appellant's proposal to make payment of their shares of the personal estate, at least of his intestate, in the currency of Confederate treasury notes. Yet some five or six months afterwards the appellant approaches the Commissioner and induces him to accept payment in Confederate treasury notes of one-half the sum secured by his bond, making no disclosure of the fact of his having been forewarned by Mrs. Blackwell on behalf of herself and her children that no payments in that currency would be received by them.

If the appellant had moved in the Circuit Court for an order authorizing the collection of his bond in Confederate currency, and the respondent had objected, "such objection would certainly have received attention; for the Court would not have authorized the acceptance of anything but the legal tender of the country against the will of any party interested in the fund."—Circuit decree in *Wiseman & Finley* vs. *Hunter*, 14 Rich. Eq., 167; Circuit decree in *Johnstone* vs. *Crooks*, 3 S. C., 200. Where, as in this case, the debtor, after proffering to pay his creditor otherwise than in lawful money, and after having had his proffer rejected, makes such payment to his creditor's agent, he being ignorant of his principal having already refused the same, such a transaction, as against the creditor, has all the essential characteristics of a fraud.

3. The appellant stood in such fiduciary relations towards the respondents as required of him scrupulous integrity and the utmost frankness and fairness in all his dealings and transactions respecting the land sold to him by the Commissioner or the payment of the purchase money for the same.

(a.) Of the land referred to, the appellant and respondents were tenants in common, and the former was in possession of the same. One of such tenants cannot purchase and hold for his exclusive benefit a claim or lien affecting their lands. "It is not consistent with good faith, nor with the duty which the connection of the parties, as claimants of a common subject, created, that one of them should be able without the consent of the other to buy in an outstanding title and appropriate the whole subject to himself."— *Van Horne* vs. *Fonda*, 5 John. Ch., 407.

In *Huson* vs. *Wallace*, (1 Rich. Eq., 1,) Chancellor Harper in his Circuit decree, affirmed on appeal, remarks: "I have determined during the present sitting, in the case of *Goulding* vs. *Goulding*, that the tenant in common possession is *a trustee* to preserve the estate for the rest." It is no sufficient answer to say that whatever may have been the fiduciary relations between the parties, arising out of their tenancy in common, such relations ceased upon the Commissioner's sale of the land to the respondent. Upon the sale of land under proceedings for partition the purchase money is substituted for the land as the subject of partition.—Ch. Harper's Circuit decree in *Gillett* vs. *Powell*, Speer's Eq., 150. The interests of the parties in the purchase money after the sale correspond precisely with their interests in the land prior to such sale. The parties, therefore, continued to have an interest in common in respect of the purchase money; and "community of interest," says Chancellor Kent, "produces community of duty."— *Van Horne* vs. *Fonda*.

(b.) The children of the appellant's intestate were all infants at the sale of the lands to the appellant and at the date of his alleged payment upon his bond to the Commissioner. "The rule laid down in *Dormer* vs. *Fortescue* (3 Atk., 130,) is that he who takes possession of the estate of an infant holds as *bailiff* or *guardian* of the infant."—*Harvin* vs. *Riggs*, Rich. Eq. Cas., 291.

The very fact of his having purchased the land placed the appellant in a fiduciary relation towards the respondents.

"When a contract is made for the sale of an estate, equity considers the vendor as a trustee for the purchaser of the estate sold, and the *purchaser as a trustee of the purchase money for the vendor.*"—1 Sugd. Vend. and Purch., 191.

The trust thus assumed by the appellant he claims to have fully and faithfully performed by making payment to the agent of the respondents, and against their declared consent, in·a depreciated currency, which has since perished, and was even then worth but a mere fraction of its nominal value.

4. James Blackwell and the appellant Tucker were owners as tenants in common of the lands referred to. The former (Blackwell) died intestate, and thereupon the appellant became his administrator and passed into the possession of his whole estate, real and personal. In the case of *Huson* vs. *Wallace*, already cited, the lands of an intestate had been sold by the Commissioner at public outcry, under an order of the Court, in a suit for partition of the same, and at such sale were purchased by the administrator at an inadequate price. It was held by the Court that, independently of any charge of unfairness or fraud, the administrator was bound to account for the full value of the land at the time of the sale. Chancellor Harper in his Circuit decree, which was affirmed, remarks: "I am of opinion that McMeekin (the administrator) did stand in such a relation of confidence to the estate and children of Lewis (the intestate) as to throw on him the burden of proving that he gave a full and adequate price for the property, and that on his failing to do so his estate must be charged with the full value. It comes within the rule which applies to a trustee purchasing of his *cestui que trust*. Nor does it make any difference that instead of bargaining with the persons to whom he stood in the confidential relation he bargained with the officer of the Court who was the agent of all parties in a judicial sale. I should think he came within the rule if there was nothing else but that he was an administrator in possession of the land."

The respondent has gone through the form of a purchase for an adequate price; but, by payment of the purchase money in a depreciated currency to the agent of his co-tenants, has, in fact, obtained their land at a price less than the one-seventh part of its actual value. What the law forbids to be done directly it will not permit to be effected by any indirect agency or device.

July 1, 1876.   The opinion of the Court was delivered by

Moses, C. J.   James Blackwell died intestate, and letters of administration on his estate were in due form granted to the appellant, Landon Tucker, who, with the decedent in his lifetime, was seized of equal undivided moieties in three certain tracts of land, which, under an order on a bill filed in 1858 by the respondents, (with two other of the children, since deceased,) his heirs at law and distributees, were sold for partition on the 30th day of December, 1860.   Appellant here was a party defendant in the same proceeding, and purchased the said parcels of land at the sale by the Commissioner in Equity for the sum of $7,525, executing his bond on the same day, payable with interest from date in two equal annual instalments.   On the day of its execution the bond was credited with $263.16, and on July 6, 1863, the following entry was endorsed:  "Received $4,293, one-half of the bond."   The payment last made was in Confederate treasury bonds.   The present complaint, (by the heirs at law and distributees of the said Jame Blackwell against the said Landon Tucker,) after stating the facts above recited, charges that prior to July, 1863, the appellant had applied to the said Susan Blackwell, one of the plaintiffs, the widow of the intestate and the mother of her co-plaintiffs, to receive Confederate bonds in payment, and that she had " peremptorily declined to do so." It prays that payment " on the said bond be declared illegal, invalid and fraudulent ; that the bond may be set up against the defendant and the statutory lien on the lands enforced."   The case was sent to a Referee to take and report the evidence, and, as the Circuit Judge granted the full relief prayed, we are to assume that the facts upon which it was claimed, in his judgment, must have been well sustained by the testimony.   Our examination of it leads us to the same conclusion which he reached in regard to it.

It is first objected that " the plaintiffs are neither payees nor assignees of the bond, nor entitled to receive the proceeds when collected, the defendant being entitled to one-half."   If the instrument is not made payable to them, it is to the Commissioner, who, as to one-half the amount it was intended to secure, stands to them in the relation of a trustee.   They have a direct and exclusive interest in so much of the bond as is substituted for their right and title in the lands which it represents.

The remaining exception affirms the payment to the Commissioner of the Confederate treasury bonds and his acceptance of them as a full and complete discharge of the appellant from his obligation. This assumes that the payment was made in good faith, and must, therefore, have its intended effect, when the complaint proceeds upon such fraud and imposition on the part of the obligor as, in the view of the plaintiffs, vitiates the transaction and deprives it of all efficacy and validity. To say nothing of the character of the paper tendered, which, according to *Horn* vs. *Lockhart*, (17 Wall., 580,) having been issued " for the avowed purpose of raising funds to prosecute the war then waged by the Confederate States against the government of the United States," may render doubtful their sufficiency as a consideration to sustain a contract, the credit is resisted because procured in violation of good faith and with a purpose to prejudice the interests of the plaintiffs, who, through the mother, speaking for herself and them, had refused to accept payment in the mode he afterwards imposed on the Commissioner. It averred, however, that, the treasury bonds having been accepted in payment, the obligor is discharged, even though the obligee be liable. This proposition cannot be maintained to the extent which the terms employed would carry it. In *McPherson* vs. *Lynah & Gray*, *Wiseman & Finley* vs. *Hunter et al.*, *Mayer* vs. *Mordecai*, *Pickens* vs. *Dwight*, and that class of cases, where the acknowledgment by the creditor of payment concludes him from an inquiry into the manner in which it was made, the Court has been careful to exclude from the operation of the rule such acts which, though *prima facie* amounting to satisfaction, have been induced by the fraud of the obligor on the rights of the parties interested in the security.

Nor does it follow from the mere acceptance of the Confederate treasury bonds by the Commissioner, the obligee of the Tucker bond, that they for whose use and benefit it was held are necessarily deprived of all interest in it. In the opinion of the Court in *Johnston* vs. *Crook*, (3 S. C., 203,) it is said: " It is scarcely necessary to refer to authority to show that what the creditor takes and acknowledges as payment of his debt must be so considered, unless some fraud or imposition has been practiced to induce him to receive in lieu of his demands that which was never intended to be accepted as an equivalent for it."

This qualification was but the result of a familiar principle of equity, which avoids all transactions into which fraud or improper inducement enters. Nor is it essential that the fraud should consist of affirmative representations not founded in truth. A willful suppression of a fact which, if disclosed, according to the motives which usually influence human action, would most likely have prevented the result complained of, is as effectual in the consummation of a fraud as unfounded or untruthful declarations. While the object is to promote individual interest to the prejudice of the rights of others, it may be attained as readily by resorting to the one mode as the other.

While knowledge of the fact that Mrs. Blackwell, in January or February, 1863, when neither of her children was of age, refused to accept Confederate money in settlement of her and their proportion of the bond, or on account of his administration of the personal estate of the intestate, the appellant in the July following, withholding from the Commissioner all knowledge of such refusal, tendered not even Confederate notes, which had displaced all other currency, but Confederate treasury bonds, which had never prevailed as a circulating medium. If he had been a mere stranger, the purchaser of the lands, having no interest in them as a tenant in common with the plaintiffs when they were sold, good faith would have required him to disclose to the Commissioner, whether regarded as their agent or trustee, his knowledge of their refusal to accept in payment the bonds he offered. Willfully withholding it, he induced a consent which probably would not have been yielded with notice of the fact, which the appellant by every moral consideration was bound to impart to the Commissioner. He, however, was contented to remain silent, supposing, as we are now obliged to infer, that by this adroit mode he could best accomplish the design he had in view.

But when it is considered that the appellant was the administrator of the intestate, and, although not vested with the title to the land of which he died seized, yet, according to our decisions, having some control in the care and management of it until possession taken by the heirs, and when it is recollected, too, that in the very bond which represented the land he and the intestate had held as tenants in common, he had an interest of one-half,—that, being the purchaser, he stood as a trustee for the purchase money,—would it not be in violation of every principle of equity and justice to allow

him to retain and enjoy an advantage secured to him by an attempted sacrifice of the rights of others in regard to whom he held a relation which, to say the least, demanded in the particular transaction the exhibition and practice of good faith and fair dealing? The motion is dismissed.

The time fixed by the order of the Circuit Judge within which the amount decreed to be due must be paid, and in default thereof the lands sold, having expired, the case must be remanded to the Circuit Court for such further orders as may be necessary to give effect to the judgment of that Court now here confirmed. It is so accordingly ordered.

*Wright,* A. J., and *Willard,* A. J., concurred.