# MORGAN'S ADM'R *vs.* MORGAN'S DISTRIBUTEES.

[FINAL SETTLEMENT AND DISTRIBUTION OF DECEDENT'S ESTATE.]

1. *Presumption in favor of ruling of primary court.*—In a probate case, where the correctness of the ruling of the primary court depends on the proof, and the bill of exceptions does not purport to set out all the evidence on which the probate judge acted, the appellate court will presume that his rulings were correct.

2. *Sufficiency of proof to entitle administrator to credit.*—An administrator will not be allowed a credit, on final settlement of his accounts, for the amount of a promissory note, which purported to be executed by him, for the intestate, a few days before the death of the latter, on proof that it was "settled by account against the estate of" the payee, without any evidence to show that the intestate authorized him to execute the note in his name, or that the intestate was indebted to the payee in the amount of the note.

3. *Form of decree in favor of infant distributee.*—On the final settlement of an estate, if an infant distributee has no general guardian, or if his general guardian fails to attend, a decree may be rendered in favor of the infant, by his guardian *ad litem*; and when the money is collected on such decree, it should be paid into court, to be received by the general guardian, whenever he is appointed and applies for it.

APPEAL from the Probate Court of Dallas.

IN the matter of the final settlement and distribution of the estate of Asa T. Morgan, deceased, by James T. Colley, his administrator. The errors assigned in this court are, the rendition of a decree in favor of two of the infant distributees, by their guardian *ad litem*, without the appointment of a regular guardian; and the rulings of the probate court in charging the administrator with the hire and present value of a slave named Jesse, in charging him with $506 on account of a tract of land sold by the intestate in his life-time to one William C. Jones, and refusing to give him credit for the amount of a promissory note for $674 hereinafter more particularly described. The rulings of the probate court in reference to these several items are thus stated in the bill of exceptions:

" The distributees moved the court to charge the administrator with the sum of $1530, for money received by him for land sold by the intestate in his life-time to

one William C. Jones, instead of the sums with which
the administrator had charged himself in his account, as
'$400, cash on hand at death of intestate,' and '$625,
amount collected on note of W. C. Jones;' and, to sustain
said charge, introduced as a witness one John P. Jones,
a son of said W. C. Jones, who testified, that his father,
since deceased, in July, 1854, (prior to the 7th day of that
month,) bought a tract of land from said intestate, for
which he agreed to give $1530; that on the 7th July,
1854, as agent of his father, he went to the house of said
James T. Colley, where the intestate then was, to pay a
part of the purchase-money, and to get a deed for the
land; that he paid the intestate $500, which the latter
immediately handed to said Colley, and obtained a deed
for the land; that the intestate then said, 'I am glad you
have paid me this money, as I can now redeem my boy
Jesse from Sawyer, who has a mortgage on him, as I need
him to wait on me;' that Colley also said, 'he was glad
the money was paid, as Morgan wanted it to redeem the
slave from Sawyer's mortgage;' that said money was
handed by the intestate to Colley for the purpose of
redeeming said slave; that the intestate was then sick,
but was capable of doing business; that he signed the
deed, and gave witness a receipt for the money, but grew
worse from that time, and was incapable of doing any
business in a day or two, and so continued until his death,
which occurred on the 24th July, during all which time
he was confined to his bed at the house of said Colley.
Said witness further stated, that Colley called at his
father's house a few days afterwards, and brought an
order, which purported to be signed by the intestate,
dated the 7th July, directing his father to pay said Colley
$506; that he knew the intestate's handwriting, and had
frequently seen him write, and did not believe that said
order was written or signed by him; that his father, on
the receipt of the order, executed his note for $506, paya-
ble to said Colley, and another note for $625, payable to
the intestate, and delivered both of said notes to said
Colley. These notes the witness produced to the court,
and further testified, that, though dated on the 7th July,

1854, they were in fact executed several days after that time; and that the full amount of said notes was afterwards paid to said Colley while he was the administrator of said intestate's estate.

"The administrator introduced one Huggins as a witness, who testified, that in January or February, 1854, when he was at said Colley's house, the intestate called on him to take notice that he had had a settlement with his brother, Stephen Morgan, and with said Colley, and that he owed said Colley upwards of $500, and said Stephen Morgan upwards of $600; that said Colley and Stephen Morgan were both present at the time, and the intestate was then in good health; that he heard no statement of accounts between the parties, and knew nothing of any accounts against the intestate, in favor of Colley, except what the intestate told him in that conversation; and that said intestate also told him, at the same time, that he had given Colley an order on W. C. Jones for some money, the amount of which witness could not recollect. The distributees then recalled said John P. Jones, who testified, that his father was never indebted to said intestate until some time in July, 1854, when the trade for the land was made; and one Marvin testified to the same effect.

"The distributees also moved the court to charge said administrator with the hire of a slave named Jesse, from the time he went into the possession of said administrator after the death of the intestate, and with the present value of said slave; and, to sustain said charge, in addition to the evidence above stated, proved that said slave belonged to the intestate before his death, and was in his possession a short time before his death, when said slave went into the possession of one Sawyer, who had possession at the death of the intestate; that said slave went into the possession of said administrator in August, 1854, and that letters of administration were granted to him in the same month. The administrator then read in evidence the deposition of said Sawyer," the substance of which may be thus stated: Witness purchased the boy Jesse from the intestate at the price of $1,000, which he paid by

giving his note for $670, the balance ($330) having been previously loaned by him to the intestate. At the time of this purchase, "it was verbally agreed that the intestate, if he could raise the money to do so, should have the privilege of redeeming or buying back the said negro at the same price, within six months or a year; or that any other person, through whom the intestate might raise the money, should occupy the position of witness in reference to the purchase of the negro." This contract was made about two months before the death of the intestate. A few days before the intestate's death, witness received a letter from him, requesting him to return the boy to Mr. Colley, as he (intestate) wanted the boy to wait on him;" and stating that he had made arrangements through Colley to raise the money to redeem the boy. When witness received this letter, he was on his way to South Carolina. On his return home, which was after the death of the intestate, Colley repaid him the money which he had loaned to the intestate, and delivered up his note for $670; and witness then surrendered the negro to him, and transferred to him the bill of sale from the intestate. Within a month or two afterwards, the bill of sale having become blotted, witness executed to said Colley a new bill of sale for the negro.

" Thereupon, the court struck out of said administrator's account the item with which he had charged himself, (being the amount of said Sawyer's note for $670 with interest,) and charged him with the sum of $450 on account of the hire of said negro from the time he obtained possession, and $1350 as the present value of said negro, and credited him with the sum of $330 paid to said Sawyer, with interest thereon; to which ruling and action of the court the said administrator excepted. As to the purchase-money of said land, the administrator had charged himself with $400, as ' cash on hand at death of intestate,' and the further sum of $625, as ' amount collected on note of W. C. Jones.' The court ordered that said charges should stand as made, and that the administrator should be charged with the further sum of $506, with interest thereon, being the amount of said Jones' note,

payable to said Colley, for a part of the purchase-money of said land; to which action of the court said administrator excepted."

The administrator asked to be allowed a credit for the amount of a promissory note for $674, which he produced, dated the 7th July, 1854, payable to S. M. Morgan or bearer, and signed "Asa T. Morgan, by James T. Colley;" on which note was endorsed a credit for $190 88, as of the 7th July, 1854, and another credit for $250, as of the 22d July, 1855. " To sustain this credit, said administrator introduced one Dennis as a witness, who testified, that he was the administrator of said S. M. Morgan, and that said Colley had settled said note with him by an account against the estate of said S. M. Morgan. Another witness testified, that said Colley and Asa T. Morgan were brothers-in-law, and very intimate; that Colley frequently assisted said Morgan in his business; and that said Morgan was at Colley's house in July, 1854, and remained there until his death. This, with the other evidence above stated, was all the testimony offered to sustain said charge. There was no proof that Colley was authorized to sign the note, or that the intestate had ever seen or recognized the note, or that it was in existence at the death of the intestate. The court refused to allow the administrator a credit for the amount of said note, and the administrator excepted."

GEO. W. GAYLE, for the appellant.

E. W. PETTUS, *contra*.

R. W. WALKER, J.—When the correctness of the decision of the probate judge depends upon the proof, and it does not affirmatively appear that all the evidence upon which he acted is set out in the record, this court will presume that the decision was correct.—Bradley v. Andress, 30 Ala. 80 ; Lovett v. Chisholm, *ib*. 88; Fleming v. Ussery, *ib*. 240; Henderson v. Renfro, 31 Ala. 105 ; Stein v. Feltheimer, *ib*. 57. The bill of exceptions does not purport to set out all the evidence which was before the court in reference to the charges for the hire and

value of the negro Jesse, and for the sum of $506 on account of the land sold to Jones. We cannot say, therefore, that the court erred in its decisions upon these items. Southern Mutual Ins. Co. v. Holcombe, at this term.

2. We do not perceive that the court erred in refusing to allow the administrator credit for the note for $674, payable to S. M. Morgan. There was no proof that the intestate made the note, or authorized Colley to sign it. No reason is shown why the intestate did not sign the note himself. It was dated 7th July, 1854; and it was shown that he was then competent to transact business, and did in fact on that day sign the deed to Jones. The evidence of the mode of payment was vague and indefinite. It is stated that the administrator settled the note " by an account against the estate of said S. M. Morgan;" but it is not shown whether this account was in favor of the administrator, or of his intestate. The only evidence, apart from the note itself, tending to show that the intestate was in fact indebted to S. M. Morgan, was the testimony of Higgins, and he was contradicted, in a material part of his statement, by the witnesses Jones and Marvin.

3. On the final settlement of an estate, an infant distributee may be represented by his general guardian; but, if there be no general guardian, or if, after being notified, he fails to attend, it is the duty of the court to appoint a guardian *ad litem.*—King v. Collins, 21 Ala. 363. In that case, there is no doubt that a decree may be properly rendered in favor of the infant by his guardian *ad litem;* and although it may be true, that the guardian *ad litem,* like the *prochein ami* of an infant in a suit at law, has no right to receive the money on the decree; yet it does not follow that execution could not be properly issued on it. In such a case, the money, when collected, could, and ought to be paid into court, to be received by the general guardian of the infant, whenever he is appointed, and applies for it. This is not like the case of Fagan v. Fagan, 15 Ala. 338. There the decree was in favor of the infant, without the interposition of any guardian, either general or *ad litem*; and it was held, that no execution could properly issue on it. Here the record shows a regular

appointment of a guardian *ad litem*, and the decree is in favor of the infant by his guardian. The order for an execution upon such a decree is not improper.—See Smith v. Redus, 9 Ala. 99.

The decree is affirmed.