HORN *v.* LOCKHART ET AL.

1. When objection is taken to the jurisdiction of the Circuit Court of the United States by reason of the citizenship of some of the parties to a suit, the question is whether to a decree authorized by the case presented they are indispensable parties. If their interests are severable from those of other parties, and a decree without prejudice to their rights can be made, the jurisdiction of the court should be retained and the suit dismissed as to them.

2. To a suit brought in the Circuit Court of the United States by legatees in a will to compel an executor to account for moneys received by him from sales of property belonging to the estate of his testator, and to pay to them their distributive shares, it is no answer for the executor to show that he invested such funds in the bonds of the Confederate government by authority of a law of the State in which he was executor, and that such investment was approved by the decree of the probate court having settlement of the estate. Such investment was a direct contribution to the resources of the Confederate government, and was an illegal transaction, and the decree of the probate court approving the investment and directing the payment of the distributive shares of the legatees in such bonds was an absolute nullity, and affords no protection to the executor in the courts of the United States.

* 21 Howard, 184.                † 16 Wallace, 479.

8. The acts of the several States in their individual capacities, and of their different departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the National authority, or the just rights of citizens under the Constitution, are, in general, to be treated as valid and binding.

APPEAL from the Circuit Court for the Southern District of Alabama; the case being thus:

In March, 1858, one John Horn, of Marengo County, Alabama, died, leaving a considerable estate, including a homestead plantation of 720 acres, a smaller tract of 208 acres, with other pieces of land, seventy-eight negro slaves, and other personalty; and leaving also a widow and six children, among them a son, John A. C. Horn, and daughters; one married to William Lockhart, another married to Charles Lockhart, and a third married to one McPhail. These three daughters, with their husbands, resided in Texas. The rest of the children and the widow resided, as the decedent had done, in Alabama. In May, 1857, the deceased made a will, which was in existence up to a short time prior to his death. His said son alleged that it had been afterwards fraudulently purloined and destroyed. The daughters alleged that their father voluntarily destroyed it before his death.

Soon after the death of Horn, the son procured himself to be appointed administrator *ad colligendum*, and by petition in the Probate Court of Marengo County, set up a paper which he alleged to be a true copy of his father's will, with allegations as to its spoliation, &c., and praying that it might be established as his will. The widow and all the children residing in Alabama, were duly cited to appear and show cause why the alleged will should not be admitted to probate. As the Lockharts with McPhail and wife resided in Texas, a notice of the time and place set for the hearing was duly published in a newspaper, as authorized and required by the laws of Alabama. Some only of the parties interested appeared, and contested the probate of the alleged will. The question as to its validity was tried by a jury according to the laws of Alabama; and it was estab-

lished by their verdict and the judgment of the court in September, 1858. In November following, letters testamentary were issued to the son, as the executor.

By the will thus established, the homestead was given to the son after his mother's decease, and the smaller tract of 208 acres was directed to be sold and the proceeds divided equally amongst the daughters. The residue of the estate was to be equally divided between all the children. The widow repudiated the will and claimed her dower.

On the 29th of December, 1858, by order of the court, a division of the slaves of the testator was made between his widow and children, by commissioners appointed for the purpose and upon a valuation then made. The daughters severally, with their husbands, gave receipts for those which were assigned to them in this division; the receipts reciting that the slaves received were in full of their distributive share of the negro property of the deceased. At the same time the executor made payments of money to the daughters, and took receipts for the amounts, reciting that they were in part payment of their claims against the estate.

In October, 1859, the executor filed a partial account of his administration, including his sales of property at the said division of slaves. Some of the items of the account were contested, but in May, 1860, a decree was finally made by which it was declared that the executor had in his hands for distribution $10,783, proceeds of the land sold and to be divided among the daughters, and $5159, proceeds of personal property to be divided among the widow and children in accordance with the will, specifying the amount payable to each. Such division was accordingly made, and receipts taken by the executor from the parties.

In August, 1860, and January, 1861, a citation was issued at the suit of some of the daughters to call the executor to a final account. There was then a balance in his hands due from one Craighead, the purchaser of the real estate, devised for the benefit of the daughters. It had been sold on the 8th of January, 1859, on a credit of twelve months, for $10,400, of which $6240 had been paid in good money by

the purchaser, and included in the partial account settled in May, 1860. But there was still a balance due of $4160, besides interest. Craighead died in June, 1859. His wife took out letters of administration on his estate. By the laws of Alabama, she, as administrator, could not have been sued until after six months from the grant of letters of administration; but the executor did not bring suit after that term had elapsed for the balance thus due from the estate; nor did he collect the amount until October, 1862, when he took it in Confederate notes, amounting to $5075.

He kept this money, and other money of the estate which he had previously received from certain sales of property, in Confederate funds in his hand until March, 1864, when, under sanction of laws of Alabama then existing, he deposited $7900 thereof as executor in the Confederate States depository office at Selma, Alabama, and received a certificate entitling him to Confederate States four per cent. bonds to that amount. The receiving of money by Horn, Jr., as executor, in Confederate notes, and the investment of said notes in Confederate bonds, were in strict accordance with laws passed by the legislature of Alabama in November, 1861, and November, 1863, whilst that State was engaged in rebellion against the United States.

In May, 1864, on the 2d of that month, the final accounts of the executor were passed in the probate court after due publication of notice, and he resigned his executorship in accordance with the laws of Alabama. The final decree recited the fact that it appeared that the executor had invested the moneys of the estate in his hands, being proceeds of sales of property of the estate, in four per cent. Confederate bonds; and approved and confirmed the same, and directed the several shares of the widow and children of the deceased to be paid to them in said bonds. The bonds were never accepted by the legatees, nor did it appear that they were ever tendered to them by the executor.

In this state of things, the Lockharts, resident as already mentioned in Texas, filed their bill, on the 15th of November, 1867, in the court below, against Horn, the executor, the

widow, and the other daughters and their husbands (all of them being residents of Alabama, *except McPhail and wife, who, as already said, resided, as did the complainants themselves, in Texas),* to set aside the alleged will, which had been admitted to probate in September, 1858, and to recover their distributive share of the estate of their father, or in case the will should be sustained, to recover from the executor the balance due them as legatees, which he had invested in Confederate bonds; they insisting in their bill that there was no law, either valid or pretended, which authorized the Probate Court of Marengo County to render a decree making the amounts due them payable in Confederate bonds, and alleging that no such bonds were ever paid to or received by them.

Objection was taken in the Circuit Court to its jurisdiction, on account of the residence of these two defendants in the same State with the complainants.

The court in its final decree directed the bill to be dismissed as to these two defendants, as not being essential parties to the suit by the complainants.

On the main question the court held that the complainants were barred by the statute of limitations of Alabama, from filing a bill to set aside the will, and were estopped from doing so by their own acts, inasmuch as after the will was admitted to probate they had twice received, without objection or protest, dividends of the property of the deceased, founded on the directions of his will, and gave to the executor acquittances therefor; that in this they had recognized the will, and recognized the son as the executor thereof, and that they could not afterwards come into a court of equity without any allegation of fraud or concealment, or newly discovered evidence, and ask to have the will set aside.

But the court held that the executor could not exonerate himself from liability for the balance adjudged due the legatees, by paying the same in Confederate bonds. It observed that as a general rule all transactions, judgments, and decrees which took place in conformity with existing

laws in the Confederate States between the citizens thereof, during the late war, *except such as were directly in aid of the rebellion, ought to stand good;* that the exception of such transactions was a political necessity required by the dignity of the government of the United States, and by every principle of fidelity to the Constitution and laws of our common country; that by this rule the present case must be judged, and that by this rule the deposit of the $7900, money of the estate, in the depository of the Confederate States at Selma, could not be sustained, as it was a direct contribution to the resources of the Confederate government. The decree of the court, therefore, directed the executor to pay to the complainants in lawful money of the United States the several sums adjudged to be due to them by the probate court on the rendition of his final account in May, 1864. From this decree an appeal was taken by the executor alone.

The case was twice argued.

*Mr. P. Phillips, for the appellant:*.

I. The final decree is the first notice which the record gives of the dismissal of the bill as to McPhail, and wife: But whether or not the court had jurisdiction of the cause must be determined by the state of the cause when it was submitted for decision. Even *Conolly* v. *Taylor*,* which may be relied on by the other side, does not justify the action in this case. Counsel there had been arguing that the jurisdiction depended on the state of the parties *at the commencement of the suit.* The Chief Justice says, in reply, that the defect may "be corrected at any time *before* the hearing." Again he says:

"Had the cause *come on for a hearing* in this state of parties a decree could not have been made for want of jurisdiction. The name of the citizen, plaintiff, was, however, struck out of the bill *before the cause was brought before the court.*"

The bill here is filed by the Lockharts to set aside a will, to have distribution made of the estate, and an account against

---

* 2 Peters, 564.

the executor. In such a bill McPhail and wife were necessary parties,* and in dismissing the bill as to them to cure the defect of jurisdiction, it was made defective for want of necessary parties.

II. It is not necessary to argue that the decree of the probate court, though made during the civil war, was not *for that reason void.* The court had jurisdiction of the subject-matter and of the parties. In recognizing the legality of the investment in Confederate bonds, and ordering distribution in them, it had the sanction of the laws of the State and of the Confederate States, under whose dominion it exercised its functions. All the parties to the controversy were voluntarily under this dominion, and whatever was consummated under these laws cannot be readjudicated except by provisions of law enacted for that purpose. Admitting, for the argument, that these laws could be held as invalid, the only consequence would be, not that the decree of final settlement was void, but that it was erroneous, and the time and manner for correcting the error must be looked for in the statutes of the State.† That the present decree was final, and concluded all the parties, until reversed, was decided by the Supreme Court of the State, in 1870,‡ in a proceeding by one of the parties to the present bill, who sought to open it.

[The counsel then, in order to ascertain particularly what these laws were, gave a history of legislation *during* the war, inferring from it as plain that all parties aggrieved by judgments or decrees rendered during the civil war had a remedy by way of new trial or appeal.

He also referred to statutes *prior* to the war, allowing a bill to correct any error in a settlement with an executor in the decree of the probate court, if filed within *two years* from the date of the decree; arguing that after making all allowances this bill was about two months too late.]

But if the bill had been filed in time, the decree was

---

* Barney v. Baltimore, 6 Wallace, 283.

† Wyman v. Campbell, 6 Porter, 219; Thompson v. Tolmie, 2 Peters, 162; Beauregard v. City of New Orleans, 18 Howard, 502.

‡ Horn v. Bryan, 44 Alabama, 88.

wrong in holding the executor liable by reason of his fund-
ing the Confederate money. It is said that this was an act
in aid of the rebellion which the dignity of the government
will not allow to stand good. But, how so? This is not a
case where a party is asking the aid of the court to enforce
an illegal contract or to enforce a right arising under an un-
constitutional law; but is an appeal to the court to relieve
one of the parties to a consummated act to set aside a judg-
ment rendered under a government exercising full dominion
over all the parties to it, and with their assumed assent. In
such a case it does not lie in the mouth of a complainant to
say that the court of probate could not exercise judicial
power during the war, nor that these proceedings are
erroneous in carrying into effect the laws of the Confederate
government, because made to facilitate the war against the
government of the United States. If the statute was illegal
the complainants must be considered in law as having been
parties to it, and as responsible and as much bound as if the
record had shown that they were themselves the authors of
it; as between citizens thus situated all consummated acts
are beyond the reach of judicial revision. The court will
not lend its aid to them to undo their own acts.

It may be stated here as matter of fact that the law of the
Confederate government, under which the investment under
consideration was made, and which was passed on the 15th
of February, 1864, required Confederate notes to be funded
by a certain time, and enacted that on failure to have them
so funded they should no longer be receivable for public
dues; they were also to be taxed $33\frac{1}{3}$ per cent., and in addi-
tion thereto 10 per cent. a month. Now, if the executor
under this law had failed to fund, and allowed the notes to
perish on his hands, the complainants in the courts of the
Confederacy would have had a perfectly clear case for con-
demning him. Can they now come into the courts of the
United States and hold the executor liable on the opposite
ground?

These principles here advanced have been fully sustained

by the highest court in Alabama, Mississippi, and Virginia.*

The conduct of a trustee or agent must not be judged of by matters *ex post facto.*

The funding by the executor can in no just sense be considered as an act " in aid of the rebellion." It is not pretended that the funding was made with such intention, but, whether with or without intent, was it such an act? By funding the notes the debt of the Confederacy was neither augmented nor diminished; its form was only changed. By failing to fund, the debt was diminished by so much currency made valueless, without any increase in the bonded debt. It is therefore evident that, with the alternative before him to fund or not to fund, the executor acted in the mode least beneficial to the finances of the Confederacy, and for so acting—that is to say for not having given greater aid to the rebellion—the decree holds him liable!

Admit, however, that this funding was illegal, and that consequently the executor is liable as for a conversion, this would not charge him in specie or its equivalent with the amount of the funds converted. The money which he received was, of course, Confederate notes (the only currency of the South), and the measure of his liability is their value at the time of conversion.† To this extent the decree ought in any view to be modified.

*Mr. J. T. Morgan, contra.*

Mr. Justice FIELD delivered the opinion of the court.

The validity of the will of John Horn, deceased, is not a question for our consideration. The Circuit Court held that the statute of limitations of Alabama had barred the right of the complainants to contest its validity, and also that they were estopped from such contestation by accepting, without objection or protest, dividends of the property founded upon the directions of the will. The executor and principal de-

---

* Watson and wife *v.* Stone, 40 Alabama, 451 ; Trotter *v.* Trotter, 40 Mississippi, 710.

† Head *v.* Talley, Administrator, 3 American Law Times, No. 9, p. 155.

visee does not, of course, controvert the correctness of this decision, as it sustains his position, and the complainants. have not appealed.

The case, as presented to us, therefore, is one where an executor in Alabama is alleged to have misappropriated funds of an estate, to which legatees in Texas were entitled, and to enforce from the executor an accounting and payment the legatees ask the aid of a court of the United States.

The objection to the jurisdiction of the court, that two of the defendants were residents of Texas, the same State with the complainants, was met and obviated by the dismissal of the suit as to them. They were not indispensable parties, that is, their interests were not so interwoven and bound up with those of the complainants, or other parties, that no decree could be made without necessarily affecting them. And it was only the presence of parties thus situated which was essential to the jurisdiction of the court. The rights of the parties, other than the defendants who were citizens of Texas, could be, and were, adequately and fully determined without prejudice to the interests of those defendants. And the question always is, or should be, when objection is taken to the jurisdiction of the court by reason of the citizenship of some of the parties, whether to a decree authorized by the case presented, they are indispensable parties, for if their interests are severable and a decree without prejudice to their rights can be made, the jurisdiction of the court should be retained and the suit dismissed as to them.*

Upon the accounts presented by the executor to the probate court in Alabama for settlement, it appears that he received moneys from the sales of property belonging to the estate of the testator, amounting to over seven thousand dollars, and invested the same in bonds of the Confederate States. By the decree of the probate court this investment was approved, and the executor was directed to pay the legatees their respective shares in those bonds. Now the question is whether this disposition of the moneys thus received,

---

* See Barney v. City of Baltimore, 6 Wallace, 280; and Shields v. Barrow, 17 Howard, 130.

and the decree of the court, are a sufficient answer on the part of the executor to the present suit of the legatees to compel an accounting and payment to them of their shares of those funds.

It would seem that there could be but one answer to this question. The bonds of the Confederate States were issued for the avowed purpose of raising funds to prosecute the war then waged by them against the government of the United States. The investment was, therefore, a direct contribution to the resources of the Confederate government; it was an act giving aid and comfort to the enemies of the United States; and the invalidity of any transaction of that kind, from whatever source originating, ought not to be a debatable matter in the courts of the United States. No legislation of Alabama, no act of its convention, no judgment of its tribunals, and no decree of the Confederate government, could make such a transaction lawful.

We admit that the acts of the several States in their individual capacities, and of their different departments of government, executive, judicial, and legislative, during the war, so far as they did not impair or tend to impair the supremacy of the National authority, or the just rights of citizens under the Constitution, are, in general, to be treated as valid and binding. The existence of a state of insurrection and war did not loosen the bonds of society, or do away with civil government, or the regular administration of the laws. Order was to be preserved, police regulations maintained, crime prosecuted, property protected, contracts enforced, marriages celebrated, estates settled, and the transfer and descent of property regulated precisely as in time of peace. No one that we are aware of seriously questions the validity of judicial or legislative acts in the insurrectionary States touching these and kindred subjects, where they were not hostile in their purpose or mode of enforcement to the authority of the National government, and did not impair the rights of citizens under the Constitution. The validity of the action of the probate court of Alabama in the present case in the settlement of the accounts of the executor we do

not question, except so far as it approves the investment of funds received by him in Confederate bonds, and directs payment to the legatees of their distributive shares in those bonds. Its action in this respect was an absolute nullity, and can afford no protection to the executor in the courts of the United States.

The act of Alabama which the executor invokes in justification of the investment has been very properly pronounced unconstitutional by the highest tribunal of that State,* and the attempt of its legislature to release executors and trustees from accounting for assets in their hands invested in a similar manner rests upon no firmer foundation.

Had the legatees of the testator voluntarily accepted the bonds in discharge of their respective legacies, the case would have presented a very different aspect to us. The estate might then have been treated as closed and settled, but such is not the fact. The bonds were never accepted by the legatees, nor does it appear that the executor even went so far as to offer the bonds to them.

It is urged by counsel for at least a modification of the judgment of the Circuit Court, that the money received by the executor was in Confederate notes, which at the time constituted the currency of the Confederate States. It does not appear, however, that he was under any compulsion to receive the notes. The estate came into his hands in November, 1858, and no explanation is given for his delay in effecting a settlement until the war became flagrant. And even then he was not bound to part with the title to the property in his hands without receiving an equivalent in good money, or such, at least, as the legatees were willing to accept.

DECREE AFFIRMED.

Dissenting, Mr. Justices SWAYNE, DAVIS, and STRONG.

NOTE.

At a subsequent day a motion for rehearing was made, and an elaborate brief by Mr. Phillips filed in support thereof. The motion, however, after advisement, was DENIED.

---

* Houston v. Deloach, 43 Alabama, 364; Powell v. Boon & Booth, Ib. 459.