## Jones, *pro ami*, *v.* Fellows *et al.*

*Bill in Equity to compel Settlement of Guardianship.*

1. *Settlement of guardian, what valid.*—A decree rendered on final settlement of a resigned guardian, is not erroneous or invalid, because it shows that the minor was represented on the settlement by the succeeding guardian, instead of a guardian *ad litem;* and such decree, in the absence of fraud, or other equitable ground of relief against it, is conclusive on the minor.

APPEAL from Chancery Court of Dallas.

Heard before Hon. CHARLES TURNER.

This was a bill filed by the appellant, Olive Jones, by next friend, against the appellee, Fellows, her former guardian, and others, and sought to compel an account and settlement by Fellows in the Chancery Court, and to charge him with certain investments of her monies in Confederate bonds, which will be noticed hereafter. The bill alleged that Fellows made a pretended final settlement of his guardianship in 1864, which was void, for the reason that no guardian *ad litem* was appointed to represent appellant; no notice of settlement given; that said pretended settlement was wholly *ex parte* and void; and that Fellows had never made any legal final settlement of his guardianship.

The case made by the bill, answer and testimony, is as follows:

Josephus D. Echols, the father of complainant, died in the year 1855, seized of a large estate in lands and personal property, and leaving, as his heirs at law, the appellant and three other children, all of whom were minors at time of his death. Shortly after his death W. W. English, his brother-in-law, was appointed administrator of his estate, and on the 6th day of July, 1857, English was also appointed guardian of his children, and gave bond as such; and in June, 1859, English, on account of the personal relations between himself and one of his bondsmen, and without any order of court

therefor, executed a new bond as guardian, upon which the appellee, Fellows, became his surety. This bond was duly approved by the Probate Court. On the 2d day of January, 1861, English died without having settled either his administration of Echols' estate or the guardianship of his children, including the appellant. On the 17th day of January, 1861, Fellows was appointed guardian of the appellant and one of her sisters, the other Echols heirs being then of age, and on the same day became the administrator *de bonis non* of the estate of J. D. Echols, their father. About the same time one Waller became the administrator of W. W. English, and as such administrator, on the 1st day of May, 1861, he made a final settlement of English's administration of the estate of J. D. Echols and his guardianship of the Echols heirs, upon which settlement it appeared that the estate of English was indebted to appellant in the sum of five thousand three hundred and nine dollars and fifty cents. On the 1st of May, 1862, Fellows made a final settlement of his administration of the Echols estate, accounting for all the property of the estate which had come to his hands and was discharged. On this settlement he paid to the adult heirs the amounts due them, and carried the shares of the minors to their account with him as their guardian. On the same day (May 1, 1862,) Fellows made an annual settlement of his guardianship of appellant and her sister, on which settlement he is charged with their distributive share in the estate of their father, found due them on the final settlement of Fellows' administration of it. English in his lifetime, having as guardian of appellant and her two sisters, agreed with their brother William Echols to purchase his interest in the plantation belonging to the estate of their father, and soon after his appointment as guardian, Fellows reported these facts to the Probate Court, which thereupon made an order authorizing him, as such guardian, to carry into effect this agreement, which he accordingly did; and thereafter he managed the plantation, as the guardian of the minors and agent of the adult sisters, making annual settlements in the Probate Court, and charging himself as guardian with the amount found due his wards on each of such settlements. On the 1st day of May, 1863, Fellows made an annual settlement as guardian of appellant, on which settlement he is charged with four thousand dollars, collected by him on the 1st day of November, 1862, in Confederate currency, from Waller as the administrator of English, on the judgment rendered in favor of his ward on the settlement of English's administration of the estate of J. D. Echols and his guardianship of appellant, and is credited with the notes of various persons to

[Jones, pro ami, v. Fellows et al.]

whom he had loaned his ward's money, and the necessary disbursements for her maintenance and education.

On the 2d day of March, 1864, the appellant having expressed a desire that her brother William Echols should take charge of her property, Fellows resigned his guardianship of appellant and turned over to her brother, who had on the same day been appointed her guardian, all the property of his ward then in his hands. On the 2d day of June, 1864, Fellows, as the former guardian of appellant and agent of her sisters, made a final settlement of his guardianship and agency in the Probate Court. The account filed for final settlement was shown to William Echols, as the guardian of appellant and agent of his other sisters, more than a month before the settlement was made, Fellows at the same time showing Echols his books in which he kept the record of guardianship and agency. Echols expressed himself satisfied, and it was agreed between Echols and Fellows that, to save costs, publication should be waived and the account as stated should be passed and allowed by the Probate Court, which was accordingly done; these facts being made to appear to the court. On the final settlement of his guardianship of appellant, made on the 2d day of June, 1864, Fellows is charged with six thousand one hundred and ninety-two dollars and seven cents, and is credited with a like amount. In his accounts he is charged with the sum of three thousand and twenty-four dollars and sixty-five cents, received by him on the 7th day of August, 1863, as his ward's share of the proceeds of a house and lot which belonged to the estate of her father, and which had been sold by order of the Probate Court for division, upon the application of the other Echols heirs, and is also charged with eighty dollars interest collected on Confederate bonds belonging to his ward's estate, and is credited with two thousand dollars in Confederate bonds, which as guardian he had, on the 7th day of August, 1863, purchased with part of the money received by him as his ward's share of the proceeds of the house and lot sold as above stated. After the war, appellant (who was a minor at the time) repudiated the sale of the house and lot; brought suit against the purchaser; and, in compromise, sanctioned by the Chancery Court, received two thousand dollars in legal tender notes of the United States for her interest in said house and lot. Fellows' accounts, leaving out the debit for the proceeds of the house, received by him as guardian, and the interest on the Confederate bonds, and allowing no credit for the bonds, shows his ward indebted to him on final settlement, in the sum of eleven hundred and four dollars and sixty-five cents.

[Jones, pro ami, v. Fellows et al.]

On the hearing, the Chancellor decreed the settlement made by Fellows on the 2d day of June, 1864, a valid and binding settlement, constituting a bar to the relief sought, and dismissed the bill. This decree is here assigned as error.

SMITH & ROULHAC, and PETTUS, DAWSON & TILLMAN, for appellants.

FELLOWS & JOHNS, and BROOKS, HARALSON & ROY, contra.

STONE, J.—"In the settlement of the accounts of guardians, and in all the preparatory proceedings thereto, and appeals therefrom, the law providing for the settlement of the accounts of executors and administrators in this Code, and appeals therefrom, so far as applicable, and not in hostility with any provision of this chapter, applies to, and is in full force as to guardians and their sureties."—Code of 1876, § 2793.

"The court must appoint a competent person to represent the interest of minors and persons of unsound mind, interested in such settlement."—*Ib.* § 2510.

The reason why a *guardian ad litem* must be appointed and assigned to represent the infant, or infants, in such settlement, is very obvious. Without such appointment and representation, important interests of persons not *sui juris*, would be heard and determined, with no one of discreet years to guard their interests. The issue, in such case, is between the personal representative or guardian on the one hand, and a minor, helpless in contemplation of law, on the other. Legislative wisdom has ordained that this unequal contest shall not be tolerated; and hence a discreet person of mature age is required to be appointed, to see that justice is meted out to minors and persons *non compos mentis*.

The issue and settlement in the present case was between Fellows, the resigned guardian, and Echols, brother of the ward, chosen by her, and appointed by the court, to be her guardian. It was in no just sense a settlement between the guardian and his ward. It was a settlement between the outgoing guardian and his incoming successor. The new guardian having notice, it was his duty to see that his predecessor was brought to a fair and full account, as it was his duty to possess himself of all the estate and effects of his ward. There was no use for a guardian *ad litem* ; for her proper guardian was there, whose interest and watchfulness would be more keenly alive than those of a mere guardian *ad litem* could be supposed to be. In settling such an issue,

VOL. LVIII.

[Jones, pro ami, v. Fellows et al.]

the true inquiry is, how much shall be paid by the former guardian to the present one? No one, it is supposed, would so faithfully represent the ward, as the regularly appointed and bonded guardian.

In *Smith v. Smith*, 21 Ala. 761, this court said: "The record recites that on the day and at the term appointed for the final settlement of the estate, the administrators appeared and presented their accounts; which are shown to have been previously reported and filed for settlement; and, also, that the guardian of the minor heirs appeared. These recitals are conclusive, as to the fact of the appearance of the minor heirs by their guardian; and as this legal appearance would dispense with the necessity of notice, the real question is, whether the minors, who are interested in the distribution of an estate, can properly be represented on its final settlement by their general guardian. . . It is unnecessary to cite authorities to sustain the position, that, in general, the appearance of an infant by such a guardian is good; and we think, also, that generally speaking, he feels a higher degree of responsibility in protecting the rights and interests of the ward, than the guardian *ad litem* appointed by the court, who seems usually to consider his duties as limited to a denial of all matters which may affect the rights of the ward, without resorting to any positive or active measures to secure them. It is true, that when the general guardian is an incompetent or unfit person to represent the infant, it would unquestionably be the duty of the court to appoint a suitable person guardian *ad litem;* but in those cases in which the general guardian does appear, and is recognized by the court as the representative of the minor, we can perceive no good reason why the appearance should not be sustained."

So in *Morgan v. Morgan*, 35 Ala. 303, this court ruled that, " on the final settlement of an estate, an infant distributee may be represented by his general guardian; but if there be no general guardian, or if, after being notified, he fails to attend, it is the duty of the court to appoint a guardian *ad litem.*" See, also, *Rives v. Flinn*, 47 Ala. 481.

It is shown in the present record that Echols, the duly appointed general guardian of complainant, did appear; and that he examined and approved the accounts and the settlement. Advertisement was waived, to save expense. We perceive nothing in this which does not merit and receive our hearty approval. We hold that the final settlement made was in all respects regular, and that it is conclusive, unless assailed for fraud, or on some other equitable ground, not pretended or attempted in this record. We fully concur with the chancellor in commending the fidelity with which this trust was executed.

Here this opinion might close. It is contended, however, for appellant, that in his final settlement Fellows was allowed a credit of $2,000 for confederate bonds turned over to Echols, his successor. This item is found in Fellows' final settlement, made July 11, 1864, and is in the following language :

1863, August 7. " Confederate bonds from Lewis Davis, $2,000." This item entered into the credit column, and produced the aggregate of credits, $6,192.07. This item omitted, the credit column would foot $4,192.07. In the debit side of that account is charged against Fellows, July 17, " From proceeds of sale of house and lot in Selma, his interest being one-fourth, $3,024.65. 15th January, 1864, coupons on $2,000 of Confederate bonds, $80————." Total, $3,104.65. This sum, taken from gross debits, $6,192.07, will leave $3,087.42, as the total debits with which Fellows should have been charged. Subtracted from total credits, $4,192.07, leaves a surplus of credits over debits of $1,104.65, with which Fellows was improperly charged on his final settlement with his successor. But why take these two items from the debit account? The Confederate bonds, $2,000, being rejected as a credit, of course the interest realized on them, $80, should be rejected as a debit. The item, $3,024.65, was the one-fourth interest belonging to complainant, realized from the sale of lot in Selma. The record shows that, after the war, she repudiated this sale as not binding on her, and recovered the value of her one-fourth interest, $2,000, in lawful money of the United States. She thus realized for her fourth interest in this lot its value in lawful money, and $1,104.65, excess of collections made from Fellows in his settlement. And the testimony shows that the $2,000 invested in the Confederate bonds purchased from Lewis Davis, were part of the money derived from the illegal sale of the Selma lot, which complainant repudiated, and thereby not only prevented it from injuring her, but disarmed herself from complaining of Fellows for its illegal investment. She can not be heard to renounce the sale, and hold Fellows accountable, at the same time, for improvidence in investing its products. She can not, at one and the same time, claim under and against the sale.

We have indulged in the reflections shown above, not because the question is legitimately before us in this case. It is not; for Fellows had made a lawful settlement, and was discharged. Our purpose is to show that even if we could go behind that settlement, Mr. Fellows could not be held accountable for the $2,000 invested in Confederate bonds.— See *Horn v. Lockhart*, 17 Wall. 580.

The decree of the chancellor is affirmed.