# Tayloe *v.* Dugger.

*Statutory Real Action in nature of Ejectment.*

1. *Sale of decedent's land under probate decree; validity of order directing conveyance to purchaser.*—The court adheres to the decision in *Dugger v. Tayloe,* 60 Ala. 504, as to the necessity of notice to the administrator, of an application by the purchaser for a conveyance of lands sold by the administrator (Code, § 2648), and the invalidity of an order for a conveyance rendered on such application without notice to the administrator.

[Tayloe v. Dugger.]

2. *Adverse possession by purchaser.*—When a purchaser of land, under an executory contract, is let into possession, not having paid the purchase-money, and not having received a conveyance, he is a mere tenant at will, and does not hold adversely to the vendor; but, after payment of the purchase-money, his possession becomes adverse, and, if continued for a period longer than ten years, may ripen into a title on which he can defeat an ejectment by the vendor.

3. *Same; presumption of payment from lapse of time.*—A presumption of the payment of the purchase-money from mere lapse of time, in favor of a purchaser in possession under an executory contract, does not arise until after the expiration of twenty years from the commencement of his possession.

4. *Confederate States bonds and treasury-notes.*—Authorities cited and reviewed, as to the receipt of Confederate treasury-notes in payment, and purchase of Confederate States bonds by trustees, or investments in such bonds.

5. *Statute of limitations; exception in favor of infants.*—Infancy is no answer to the statute of limitations (Code, § 3236), when the period prescribed as a bar to the action has elapsed, and the plaintiff has been of lawful age during three years of that time, before commencing his action.

6. *Adverse possession by sub-purchaser.*—When a purchaser who is in possession, although his possession is not adverse to his vendor (not having paid the purchase-money, nor received a conveyance, or having received a conveyance which is void), sells and conveys the land to a third person, who pays the stipulated price, and is placed in possession, the possession of such sub-purchaser is adverse to the original vendor, and will ripen into a title under the statute of limitations.

APPEAL from the Circuit Court of Hale.

Tried before the Hon. LUTHER R. SMITH.

This action was brought by Hobart C. Dugger and Mrs. Alice V. Sprague, against Henry A. Tayloe, to recover the possession of a tract of land particularly described, containing about 196 acres, with damages for its detention; and was commenced on the 27th May, 1878. The defendant pleaded not guilty, and the statute of limitations of ten years; and issue was joined on both of these pleas. The plaintiffs were two of the children of Henry Dugger, deceased, to whom the land had belonged at the time of his death in 1852; and the plaintiffs claimed an undivided interest in the land as his heirs, he having died intestate, and also as heirs of one of his children, who survived him, but died before the commencement of this action. The defendant was in possession as trustee for his wife and children, under a conveyance from W. P. Bocock and wife; and it was proved that he went into possession, "under said conveyance and purchase from Bocock, about January 1st, 1861, and has been continuously in possession ever since, claiming the same as the property of his wife, occupying and cultivating it." The lands now sued for, with other adjoining lands, were sold by Mrs. Alice G. Dugger, as administratrix of the estate of said Henry Dugger, under an order of the Probate Court, on the 21st November, 1860, for division among the heirs; at which sale, said W. P. Bocock became the purchaser, and was so reported to the court, and the sale to him confirmed. On the

[Tayloe v. Dugger.]

21st March, 1868, on the petition of said Bocock, alleging that he had paid the purchase-money, an order was made by said Probate Court, directing a conveyance to be made to him by a commissioner appointed for the purpose ; and a conveyance was executed to him accordingly. On the 31st October, 1873, the plaintiffs in this suit filed their bill in equity against said Tayloe, Bocock, and others, seeking to set aside this probate decree, and to enforce a vendor's lien on the land for the purchase-money, which was alleged to be due and unpaid by Bocock ; and on appeal by the complainants in that case, this court held, at its December term, 1877, that said probate decree was void, because rendered without notice to the administratrix, and that the bill was without equity, since the complainants had a legal title, and an adequate remedy at law.—*Dugger v. Tayloe*, 60 Ala. 504–19. The action in this case was commenced after the decision was announced on that appeal. It was proved on the trial, as appears from the bill of exceptions, that Mrs. Alice V. Sprague, one of the plaintiffs, was born on the 21st July, 1847 ; and that H. C. Dugger, her co-plaintiff, was born on the 13th August, 1849. The material facts proved on the trial, as to the payment of the purchase-money by Bocock; are stated in the opinion of the court.

On the evidence adduced, all of which is set out in the bill of exceptions, the court charged the jury, on the request of the plaintiffs, " that they must find for the plaintiffs, if they believed the evidence." The defendant excepted to this charge, and requested a general charge in his own favor, which the court refused to give, and he excepted to its refusal. The charge given, the refusal of the charge asked, and some rulings on questions of evidence to which exceptions were reserved, are now assigned as error.

WEBB & TUTWILER, for appellant.

THOS. R. ROULHAC, *contra.* (No briefs on file.)

STONE, J.—When another branch of this controversy was before us at a former term (60 Ala. 504), we held that the decree of the Probate Court, directing title to be made to Bocock, Tayloe's vendor, was void, because the application for the order to make title was made by the purchaser, and no notice was given to the personal representative of Dugger's estate.—See page 519, 60 Ala. We are not inclined to review that opinion, but will adhere to it. This case, then, stands as if no conveyance had ever been made, and no order of the court granted that it should be made. This leaves

the title of the lands in controversy in the Dugger heirs, plaintiffs in this suit, if there be no other defense to the action.

The lands in controversy in this suit were sold at administration sale in 1860, on a credit of one, two, and three years; and Bocock became the purchaser, complying with the terms of sale. This sale was reported and confirmed in 1861. The sale was of a larger quantity than the present suit claims, and Bocock went into possession when he made the purchase. The present suit was brought in May, 1878. The plaintiffs were minors when the sale was made, and attained the age of twenty-one severally in 1868 and 1870,— more than ten years after it is claimed Bocock paid the purchase-money, and more than three years after the youngest plaintiff became of age. If Bocock made a valid payment, it was completed before 1864.

It is settled, both in this State and elsewhere, by a long and unbroken line of adjudications, that a purchaser by executory contract, who is let into possession without a title deed, and without paying the purchase-money, is a mere tenant at will, and does not hold adversely to the vendor. Ten years holding, under such circumstances, does not ripen into a right to hold the possession against the vendor.—*Mc-Queen v. Ivey*, 36 Ala. 308; *Ormond v. Martin*, 37 Ala. 598; *Miller v. The State*, 38 Ala. 600; *Ware v. Curry*, at the present term; Angell on Lim., 6th ed., § 406. But, after the purchase-money is paid, the purchaser thus entering becomes an adverse holder; and if such possession continues during the period of the statutory bar, it will support or defeat an action of ejectment founded on the mere legal title. Bocock, and those claiming under him, had not been in possession twenty years when this suit was brought; and hence, in the absence of proof, the presumption of payment would not arise in his favor.—*Jones v. Brevard*, 59 Ala. 499. A contention then arises, had Bocock paid the purchase-money? There is no conflict in the testimony, and the facts seem undisputed. The first payment was made in Confederate treasury-notes, which were received by Mrs. Dugger, the administratrix, without objection. The second payment was made, partly in Confederate treasury-notes, and partly in the bonds issued by the Confederate States. The third and last payment was made in Confederate bonds. Mrs. Dugger testified, that she refused to receive the bonds in payment, but delivered to Mr. Bocock his notes, and still has the bonds. Subsequently, in the spring of 1864, Mrs. Dugger made a settlement of her administration, and debited herself, and was charged with, the full amount of said purchase-money,

[Tayloe v. Dugger.]

as collected by her. Decrees were rendered against her accordingly; but, as she was guardian for several of her children who were minors, their distributive interests were passed to her debit in her accounts as guardian. The plaintiffs in this suit are two of the infant distributees of whom she was guardian, and the testimony shows they have never been paid their several distributive shares, and Mrs. Dugger and her sureties are insolvent. The question is, was this such a payment as discharged Bocock's debt? If it was, then he became an adverse holder from that time, and the statute of limitations would be a complete bar, if he were the defendant in this action.—Authorities *supra;* and *Riggs v. Fuller*, 54 Ala. 141.

The question how far Confederate treasury-notes will discharge a debt, when accepted in payment, has been a very vexed question ever since the downfall of the Confederacy. They had a purchasing power, and a conventional value, up to the surrender at Appomattox; and they were, for four years, almost the sole circulating medium accessible to many millions of people. They were issued in aid of the struggle the Southern States were making agaist the power of the Federal Government to exercise dominion within their borders; and when that armed resistance to Federal authority was overcome, and the Southrn army vanquished, this established the fact, that the issue of such Confederate treasury-notes was illegal *ab initio*, because its purpose was to aid an armed resistance to authority, ascertained and proved to be rightful; proved, by the arbitrament of the sword, the determiner in *dernier resort* of the disputes of nations and organized peoples. Their issue was, then, illegal, because it was ascertained they were aimed against the integrity of the Federal Union. Viewed from the standpoint the result of the civil war makes it our duty to take, all the Confederate securities were issued against law, and they imposed no obligation on any one for their redemption. They were issued primarily to supply to the Confederate Government a purchasing medium, that it might maintain its civil administration, and raise, equip and support the mighty armies it sent forth to the battle-field. All these purposes, as we have said, the re-establishment of Federal authority has shown to have been illegal. Yet, because the necessities of civilized life require a circulating medium, or portable representative of value, the courts at an early day ruled, that contracts between man and man, whether executed or executory, based on Confederate treasury-notes, would be upheld and enforced, from the sheer necessity the contracting parties had labored under. In thus according legal validity to such contracts, it

was reasoned that no direct aid was thereby given to the Confederate struggle. The notes had already gotten into circulation—had displaced every other circulating medium; had been paid out by the governing power, in discharge of its obligations, or in making necessary purchases; and it followed that no direct aid was rendered the government, by passing them from hand to hand. Whether they were held by A, or by B, did not increase or diminish the Government's resources. Within the territory controlled by Confederate authority, every person, whether favoring one flag or the other, was forced to employ this currency, or abstain from all commerce with mankind.

*Thorington v. Smith*, 8 Wall. 1, is the leading case in the United States Supreme Court, on this question. A recovery was had in that case, on an executory contract to pay Confederate treasury-notes for land purchased. The opinion was delivered by Ch. J. CHASE; and in speaking of this currency, he said: "While the war lasted, they had a contingent value, and were used as money in nearly all the business transactions of many millions of people. They must be regarded, therefore, as a currency, imposed on the community by irresistible force. * * Contracts, stipulating for payment in this currency, can not be regarded, for that reason only, as made in aid of foreign invasion in the one case, or of the domestic insurrection in the other. They have no necessary relations to the hostile government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and, though they may indirectly and remotely promote the ends of the unlawful government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We can not doubt that such contracts should be enforced in the courts of the United States, after the restoration of peace, to the extent of their just obligation." In the *Confederate Note case*, 19 Wall. 548, the same principle was recognized.—*R. R. Co. v. King*, 91 U. S. 3; *Whitfield v. Riddle*, 52 Ala. 467; *Waring v. Lewis*, 53 Ala. 615; *Van Hoose v. Bush*, 54 Ala. 342; *McPherson v. Gray*, 14 Rich. Eq. 121. The principle of these cases goes further. Even where a trustee sold property, or collected a demand, the property of the trust estate, if he acted in good faith, the property passed, the debt became extinguished, and no liability rested on the trustee, except to account for the funds collected.—*Hutchinson v. Owen*, 59 Ala. 326; *Cummings v. Bradley*, 57 Ala. 224.

A distinction has been sometimes drawn, between the receipt of Confederate treasury-notes, and the investment in

(29)

Confederate bonds. There can be no question, that if a trustee invested the trust moneys with the Confederate government, in payment for its bonds, this would be classed as direct aid and support to its purpose and resources, and would be pronounced illegal. He would be liable to account for the same, as for a maladministration. Such was the ruling in *Lockhart v. Horn*, 1 Woods, 628; *S. C.*, 17 Wall. 570. In that case, the court said: "The investment was, therefore, a direct contribution to the resources of the Confederate Government; it was an act giving aid and comfort to the enemies of the United States; and the invalidity of any transaction of that kind, from whatever source originating, ought not to be a debatable matter in the courts of the United States."—*Hutton v. Williams*, 60 Ala. 133; *Jones v. Fellows*, 58 Ala. 343.

In *McBurney v. Carson*, 99 U. S. 567, the trustee held a claim secured by mortgage on real estate, made before the war. The mortgagor, in 1863, sold the mortgaged premises, for Confederate treasury-notes, at a considerable advance, and with part of the proceeds paid off the mortgage debt. The court pronounced the transaction a fraud on the beneficiaries, declared the alleged payment null, and re-established and enforced the mortgage security. The conclusion of fraud in this case was reached on very little more than the fact that Confederate currency was employed in the alleged payment. This case is scarcely reconcilable with our own decision in *Hutchinson v. Owen, supra*. We think it is settled that, if a trustee invested or sold the assets or property of the trust estate, by a sale or loan to the Confederate Government, and received in exchange or payment the bonds of the latter, issued and then disposed of for the first time, such investment or sale would be pronounced illegal, and the trustee held to account therefor.

An argument may be made, that after the Confederate bonds had been sold by the Confederate Government, and passed into private hands, the fact that such bonds passed from hand to hand afterwards, in purchases and sales between the citizens, could aid the cause of the Confederacy no more than the employment of Confederate treasury-notes in like circumstances. This question is left somewhat undecided in *Planters' Bank v. Union Bank*, 16 Wall. 483. The Planters' Bank had remitted to the Union Bank Confederate bonds, to be sold for account of the former. The bonds were sold, and suit was brought for the proceeds. The Supreme Court ruled, that the Circuit Court had erred in charging the jury, "that in the circumstances of this [that] case, no action would lie for the proceeds of the sale of the

Confederate bonds, which had been sent by the plaintiff to the defendant for sale, and which had been sold by them, though the proceeds had been carried to the credit of the plaintiff, and made a part of the account.  It may be that no action would lie against a purchaser of the bonds, or against the defendants on any engagement made by them to sell. Such a contract would have been illegal.  But, when the illegal transaction has been consummated; when no court has been called on to give aid to it; when the proceeds of the sale have been actually received, and received in that which the law recognizes as having had value, and when they have been carried to the credit of the plaintiff, the case is different.  *  *  *  The plaintiff does not require the aid of any illegal transaction, to establish its case.  It is enough that the defendant has in hand a thing of value that belongs to it."   There is, in this case, a seeming implication, that the sale of the bonds was illegal, and that if the transaction had remained to any extent executory, the court would have rendered it no assistance.

Soon after Bocock purchased—before 1864—he sold the lands in controversy to Tayloe, received the purchase-money in full, executed a conveyance to him, in which his wife joined, and put him in possession.  He has retained the possession ever since.  We have shown above that Bocock, if any part of the purchase-money remained unpaid, was a mere tenant at will, and did not hold adversely to the Dugger heirs.  Does Tayloe, his vendee, occupy a better position?  If he entered and held adversely, the right of entry was barred when this suit was commenced, in May, 1878. The statute commenced running September 21st, 1865, and the bar would be complete in ten years, if there was no intervening disability.   The plaintiffs were both minors, but each attained his majority more than three years before this suit was brought.  Infancy is no answer to the statute of limitations, if the time prescribed in the statute has elapsed, and during three years of the time the plaintiffs have been of lawful age.—Code of 1876, § 3236.

In *Hunter v. Parsons*, 2 Bailey, S. C. 59, the principle is thus stated:  "A, having contracted to purchase lands of B, paid part of the purchase-money, but titles were never made. A gave the bond to his son, C, who went into possession. *Held*, that his possession was adverse, both as to A and B." In *Clapp v. Bromagham*, 9 Cow. 530, it was ruled, that where one entered as the committee of a lunatic, and made sale to another, who took possession, and claimed in absolute right, the statute of limitations commenced running from the time the purchaser so took possession.  The case of *Molton v.*

*Henderson* is almost exactly like that of *Clapp v. Bromagham, supra.* The title to the lands was in a trustee for a lunatic. One claiming to be guardian of the lunatic, but acting under a void appointment, obtained an order of the Probate Court for the sale of the lands, and sold and conveyed them. The purchaser, and those claiming under him, had had possession of the lands under claim of right and of ownership, for a length of time sufficient to bar the right of entry under the statute. The whole proceedings under which the sale and conveyance were made were void, because the order appointing the guardian was invalid and void. It was held, the statute of limitations ran in favor of the derivative purchaser, although the possession of the irregularly appointed guardian was but the possession of the lunatic, in whose right he assumed control, and made the sale.—62 Ala. 426.

*Miller v. The State,* 38 Ala. 600, was a case of sale on credit, purchase-money not paid, and no title conveyed to the purchaser. Under an execution against the purchaser, the sheriff levied on and sold the lands to Miller, who received a sheriff's deed, and went into possession, and held under claim of right, for more than ten years. This court decided, that Miller acquired no title by his purchase; but, going into possession under claim of right, he was an adverse holder, and the statute of limitations had perfected a bar in his favor. See, also, *Smilie v. Biffle,* 2 Penn. St. 52; *Steele v. Johnson,* 4 Allen, 425; *Clark v. Gilbert,* 39 Conn. 94; *Northrop v. Wright,* 7 Hill, N. Y. 476; *Beverly v. McBride,* 9 Ga. 440; *McCall v. Neely,* 3 Watts, 69; *Woodward v. Blanchard,* 16 Ill. 424; Angell on Lim., 6th ed., §§ 406 *et seq.* One who is in possession, exercising acts of ownership, and claiming to hold as of right, is an adverse holder; and a possession thus held, for the period prescribed in the statute, ripens into a bar.—*Collins v. Johnson,* 57 Ala. 304; *Ladd v. Dubroca,* 61 Ala. 25; *Smith v. Roberts,* 62 Ala. 83; *Molton v. Henderson, Ib.* 426; Angell on Lim., §§ 390, 401.

The bill of exceptions in this case shows that Tayloe "went into possession of the lands sued for about January 1st, 1861, in right of, or as trustee for his wife, under a purchase and deed from said W. P. Bocock and wife; and that he has been continuously in the possession of said land until this time, claiming the same, under his said purchase, as the property of his wife, occupying and cultivating same." This constituted him an adverse holder, and is a complete defense to the present action. The Circuit Court erred, both in the charge given, and in the charge refused.

Reversed and remanded.